UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO.: 3:05-cv-142-R

RONALD BARBER and
SARAH LYNN CUNNINGHAM                                          PLAINTIFFS

v.

LOUISVILLE AND JEFFERSON COUNTY
METROPOLITAN SEWER DISTRICT                                    DEFENDANT

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Louisville and Jefferson County Metropolitan Sewer District's ("MSD") Motion for Summary Judgment. (Docket #36). The Plaintiff, Sarah Lynn Cunningham ("Cunningham") has responded (Docket #45), and MSD has replied to that response (Docket #48). This matter is now ripe for adjudication. For the following reasons, the Defendant's Motion for Summary Judgment is **DENIED**.

## BACKGROUND

The Plaintiff alleges the Defendant acted adversely towards her at the workplace because of her status as a "whistleblower," and in doing so MSD retaliated against her protected speech in violation of her First Amendment rights. MSD is a public-body corporate and political subdivision authorized to provide and maintain sewer and drainage facilities to Jefferson County, Kentucky. Cunningham worked for MSD from 1990 through December 2004. Over the course of her employment with MSD she received consistent pay raises and job promotions, which included serving on the executive staffs of past-MSD Executive Director Gordon Garner ("Garner") and current MSD Executive Director Bud Schardein ("Schardein"). Though Cunningham generally received positive evaluations, she did receive a written warning on two (2) occasions in June 1992 (for berating a developer) and April 1994 (disrespect); and a three (3)

day suspension in May 1995 (misrepresentation of her authority).  However, her last two (2) annual performance appraisals (2003 & 2004) rated her in the "commendably achieves" category.  On Cunningham's final appraisal in January 2004, Schardein gave her the highest rating she had received in recent years.

On April 1, 2004, Cunningham mentioned to Schardein in-person her belief that Louisville Metro Council Member Robert Henderson ("Henderson"), his legislative aide Larry Mattingly ("Mattingly"), and MSD Board Member William Gray ("Gray") had abused their authority concerning the use of excess soil from MSD capital projects at Valley Village and Castle Road in Louisville, Kentucky.  Later that day, after confirming her sources, she sent Schardein an email with more details about the alleged actions by Henderson, Mattingly and Gray.

On May 6, 2004, Cunningham conducted an environmental audit on the capital projects area, inquiring about standing water with mosquito larvae at a construction area in Valley Village.  Cunningham claims that she sought to ensure that dirt from projects was being kept in its proper place.  On a site owned by Mattingly, Cunningham claims she noticed many environmental concerns from improperly filling the site with excess soil.  Cunningham then spoke with Ronald Barber ("Barber"), a co-Plaintiff in this matter, whom she alleges informed her that Henderson, Mattingly and Gray had not only used excess soil improperly, but also had threatened to fire him for trying to correct their actions.

On Friday, May 7, 2004, after completing her audit, Cunningham met in-person with Schardein once again to speak about the alleged improprieties by Henderson, Mattingly and Gray.  Schardein denied any awareness of these alleged problems.  She says that she informed

2

Schardein that she had seen fill sites without proper permits, and that Barber's job had been threatened. Schardein responded by telling her that Henderson, Mattingly and Gray were "nice guys" who were just "too interested" in trying to help. After hearing this response, Cunningham admits that she told Schardein that he better get "a fucking grip" over the situation or else the politicians would "fuck him over." Schardein then requested that Cunningham provide him with a memo of the specific names of the people involved, and she claims that Schardein gave her his word that no retribution would come to anyone who came forward with information.

The following week, on Monday, May 10, 2004, Schardein disciplined Cunningham, allegedly for the way she spoke to him. This included removing her from the environmental auditing group, and giving her a job reassignment. She was assigned to work time with the Environmental Education Program, "After We Flush," which involves setting up educational tours and sessions for elementary school children. In addition, Schardein informed Cunningham that she would either be suspended for her conduct or would have to attend an anger management class.

On May 24, 2004, Cunningham sent a letter to Commonwealth Attorney General Greg Stumbo ("Attorney General Stumbo") in Frankfort, Kentucky. The letter informed Stumbo of six (6) instances of alleged improprieties within Henderson's counsel district (District 14), all of which involved either Henderson, Mattingly or Gray. After sending the letter to Attorney General Stumbo, Cunningham furnished a copy to Schardein, who informed her that he was "not happy" that Cunningham had gone to the Attorney General, rather than him first.

During the Spring 2004, MSD began preparations for further staff reductions. Beginning in 1999, MSD had made two (2) prior staff reductions prior to 2004. That spring, each executive

3

staff member was asked to submit potential names for job elimination; Schardein offered Cunningham. He acknowledges that he picked her to be terminated at some point between May - September 2004.

In October 2004, Schardein sent an email to Cunningham over his "disappointment" with her job performance in working on "After We Flush." A day earlier, Cunningham had assured Schardein that she was hand-addressing invitations to elementary schools in the area so that they could participate. On October 19, 2004, Schardein, via email, directed Cunningham to cease "acting outside her responsibilities;" however, Cunningham did not seek out that specific situation that Schardein referred to in the email because it was brought to her attention by another Louisville Metro employee. On December 7, 2004, MSD laid off seven (7) employees, including Cunningham. MSD claims that Cunningham was terminated for her conduct while working with "After We Flush." Cunningham contends that she was terminated because of the letter she wrote to Attorney General Stumbo.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material

fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence. To support this position, he must present evidence on which the trier of fact could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tomkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

The Defendant asserts five (5) arguments as to why the Court should grant its motion for summary judgment. These include: Cunningham cannot demonstrate that her report to the Attorney General led to retaliation; her allegations were not matters of public concern for purposes of the Kentucky Whistleblower Act ("KWA") or the First Amendment claims; the allegations made by Cunningham to Attorney General Stumbo were a part of her job, and therefore, not protected speech; the allegations asserted by Cunningham were a sham; and Cunningham failed to exhaust her administrative remedies. The Court will address each of these

arguments individually.

### 1. Retaliation for Engaging in Protected Speech under the First Amendment

The Defendant contends there is absolutely no evidence to support Cunningham's claim that she was fired because of the letter she wrote to Attorney General Stumbo. To establish a *prima facie* case of retaliation under the First Amendment, "a public employee who claims that an employment decision was made in retaliation for engaging in protected speech, must show that: (1) 'the plaintiff was engaged in constitutionally protected speech; (2) the plaintiff was subjected to an adverse action or was deprived of some benefit; and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action.' *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 896 (6th Cir.2001) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977))." *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003).

To demonstrate that she was engaging in constitutionally protected speech, Cunningham must show that her speech touched on matters of public concern, and that her "'interest in making such statements outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Board of Educ. of Township High School, Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). "The Supreme Court has held that speech addressing a matter of public concern is speech relating to 'any matter of political, social, or other concern to the community.' *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). By contrast, a public employee's speech dealing with 'matters only of personal interest' is generally not afforded constitutional protection. Id. at 147, 103 S.Ct. 1684." *Id.* If the relevant part of the

speech addresses a matter of public concern, the court is then required to: "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.  After the Court has weighed these interests, if an adverse action or denied benefit against the employee has taken place, the Court, for purposes of determining whether the plaintiff has alleged a proper *prima facie* case, must then determine whether the speech may have been a substantial or motivating factor in the employer's decision to take an adverse employment action against the employee. *Banks* at 893.

     MSD contends that because Cunningham's job reassignment and disciplinary action took place before she wrote the letter to Attorney General Stumbo, those factors may not be considered for purposes of the retaliation claim.  In addition, MSD argues that Cunningham would have been terminated regardless of whether or not she wrote the letter to Attorney General Stumbo because she was not performing that well on her new job working with "After We Flush."  As such, MSD claims that Cunningham cannot demonstrate that her writing the letter to the Attorney General led to her dismissal.

     In examining the three (3) elements of a *prima facie* case for a First Amendment claim set out by the Sixth Circuit Court of Appeals in *Banks*, the Court finds that genuine issues of material fact exists as to whether or not MSD terminated Cunningham because of the letter she wrote to Attorney General Stumbo.

     In looking at the first part of the test, the letter written by Cunningham to Attorney General Stumbo qualifies as constitutional protected speech under the First Amendment.  The letter was not a part of the Plaintiff's job responsibilities, and it addressed matters of public

concern; namely, the alleged misuse of resources by a local politician, his legislative aide, and a member of the MSD board. Cunningham communicated these alleged issues to Schardein on at least three (3) occasions *prior* to sending the letter to Attorney General Stumbo that may indicate that this information was not a personal vendetta that arose after her job reassignment, but rather, her letter concerned a potential abuse of public resources. Therefore, the Court finds that the letter sent by Cunningham to the Attorney General constitutes protected speech under the First Amendment.

If these allegations contain some truthfulness, the interests of Cunningham in reporting these matters of public concern to the proper authorities outweighs the interests of MSD in promoting the efficiency of public service. In *Pickering*, the Supreme Court held that a lack of proximity and working relationship between the employee and the board members she criticized tipped the scale in favor of the employee because there was no disruption at the work place due to a letter being sent to a newspaper. *Id.* Here, similar to *Pickering*, there was no close relationship between Cunningham and Henderson, Mattingly, and Gray. *Pickering* at 568-70. The letter sent to the Attorney General did not interrupt the course of business at MSD. This is supported by the fact that Schardein claims that he did not "punish" Cunningham for sending the letter, demonstrating that MSD continued to function properly after the letter went out. Therefore, the Court finds that the interests protecting the public speech of Cunningham outweighs the interests of MSD in regulating the speech of its employees.

Further, the evidence indicates that the letter may have been a motivating factor in Cunningham's termination. Though MSD correctly points out that the job reassignment and disciplinary action took place before the letter was written, the facts also indicate that Schardein

may have targeted Cunningham for termination some time between May - September 2004, before Schardein communicated to her his displeasure about her lack of performance in October 2004. Schardein admits that he offered Cunningham's name for the cutbacks, and was not sure when he did so, but stated it was sometime "[i]n the summer" or "late summer." In addition, he has stated that he was "not happy" that Cunningham had gone to the Attorney General and that he felt "ill" about her sending the letter to Attorney General Stumbo. These statements may indicate that MSD may have sought to terminate Cunningham based on her letter to the Attorney General prior to her transgressions that took place while she worked on "After We Flush" in October 2004. Therefore, the Court finds that the letter sent by Cunningham to the Attorney General may have been a motivating factor in her termination. This is all for a jury to decide.

In its reply, MSD also cites the Sixth Circuit Court of Appeals case of *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272-73 (6th Cir. 1986), arguing that the Plaintiff cannot bring a retaliation claim if the adverse employment action took place more than four (4) months after the allegedly protected activity took place; however, *Cooper* is neither similar nor applicable to the instant matter. In *Cooper*, the plaintiff-employee had received several reprimands both prior to and after she filed a claim of discrimination with the Ohio Civil Rights Commission ("OCRC"). *Cooper*, 795 F.2d at 1267-68. Four (4) months after filing her claim with the OCRC, the plaintiff was fired by the City of North Olmsted. *Id.* Cooper filed a retaliation claim under Title VII of the 1964 Civil Rights Act. *Id.* The Court held that despite the closeness in proximity of four (4) months from the date of the filing with the OCRC and her subsequent filing, *that evidence alone* did not establish a *prima facie* case of retaliation under federal law. *Id.* at 1272-73. (applying the same standard under Title VII) (emphasis added). In reaching this decision, the

9

Court *considered the conditions leading up the alleged retaliation and the relation of the reprimands to the claim filed* in addition to the proximity of the alleged protected activities. *Id.* (emphasis added).

Here, in contrast to *Cooper*, the Plaintiff has not filed a retaliation claim based upon discrimination. The standards used for a retaliation claim based on discrimination are different than those used in a retaliation claim filed under the First Amendment. In addition, as mentioned *supra*, Cunningham does not rely upon temporal proximity alone to establish a case of retaliation under the First Amendment. The proximity standard is only applied when a plaintiff relies only upon the closeness in time, but does not provide additional evidence to support his/her claim. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563-567 (6th Cir. 2000). Further, the Sixth Circuit has held that "'[p]revious cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, *usually* less than *six* months.'" *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (quoting *Parnell v. West*, 1997 WL 271751, at *3 (6th Cir. May 21, 1997))(emphasis added). In applying the Court recognized six (6) month proximity standard to the letter sent by Cunningham on May 24, 2004, as well as the fact that the decision to fire Cunningham was made by Schardein sometime during the summer, and that Cunningham was eventually fired on December 7, 2004, the Court does not believe the Plaintiff's claim fails based on the proximity of when the alleged protected activity took place in relation to the adverse action.

At this juncture, it appears that the Plaintiff has met her initial burden in establishing a *prima facie* case of retaliation under the First Amendment. As such, this matter shall go before the trier of fact. Accordingly, the First Amendment claim for retaliation shall go forward at this

time.

## 2. The Allegations As a Matter of Public Concern for Purposes of the Kentucky Whistleblower Act and First Amendment Claims

MSD contends that the letter sent by Cunningham to the Attorney General did not involve matters of public concern for purposes of the Kentucky Whistleblower Act and the First Amendment. The Kentucky Whistleblower Act ("KWA"), KRS §61.102, protects state employees from reprisal for reporting information regarding actual or suspected fraud, waste and mismanagement. *Davidson v. Commonwealth*, 152 S.W.3d 247, 249 (Ky. Ct. App. 2004). The Kentucky Supreme Court held that an employee must establish four elements to demonstrate a violation of the KWA. *Woodward v. Commonwealth*, 984 S.W.2d 477, 480-81 (Ky.1998). In *Woodward*, the Court explained:

> First, from the context of this chapter, [KRS §61.102], the employer must be an officer of the state or one of its political subdivisions. Second, the employee must be a state employee or an employee of a political subdivision. Third, the employee must make a good faith report of a suspected violation of state or local statute or administrative regulation to an appropriate body or authority. Fourth, the defendant must be shown to act to punish the employee for making this report or to act in such a manner so as to discourage the making of this report.

*Id.* In addition, similar to a First Amendment retaliation claim, MSD correctly points out that a KWA claim must involve a disclosure that concerns a public matter. *See Boykins v. Housing Authority of Louisville*, 842 S.W.2d 527, 529 (Ky. 1992). However, as determined *supra*, for purposes of both the KWA and First Amendment retaliation claims, the letter sent by Cunningham to the Attorney General qualifies as protected speech that concerns a public matter.

MSD cites the Sixth Circuit Court of Appeals case of *Farhat v. Hood* in support of its argument that the letter written by Cunningham to the Attorney General was not a matter of

11

public concern, but instead amounted to her personal dispute with MSD. *See Farhat v. Hood*, 370 F.3d 580, 589, 593 (6th Cir. 2004). In *Farhat*, the Court determined that the "primary focus" of the letter was the employee's personal issues with the union and school district concerning his job. *Farhat* at 593. The Court reached this conclusion by noting that in his letters the employee was addressing matters that involved his employment, not issues that would concern the public. *Id.* at 584-585, 593.

Here, in contrast to *Farhat*, the letter written by Cunningham to the Attorney General did not address her personal grievances or issues with MSD executives. Rather, Cunningham's letter attempts to expose an alleged improper use of MSD resources. Unlike the matter in *Farhat*, these allegations do not relate Cunningham's personal problems with MSD. Accordingly, the allegations in the letter constitute a matter of public concern for both the retaliation and KWA claims.

### 3. The Allegations Made As Part of Cunningham's Job

MSD argues that because Schardein directed Cunningham to prepare a memorandum with all the facts and circumstances concerning her allegations, the letter she wrote to the Attorney General qualifies as part of her job, and therefore, is not protected speech. MSD asserts that its contention is supported by the recent United States Supreme Court case of *Garcetti v. Ceballos*, where the Supreme Court held that if speech is part of a directed duty of employment, it is not speech made concerning a public matter, and therefore, is not protected by the First Amendment. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960-61 (2006).

In *Ceballas*, the Court emphasized that part of Ceballos' required job duties as an assistant district attorney involved investigating pending matters and advising his supervisors on

them through a memorandum. *Id.* Here, Cunningham's letter to the Attorney General is distinguishable from report written in *Ceballos*. First, as pointed out by the Plaintiff, Cunningham communicated her allegations outside of her employment, and not to her supervisor. In addition, the Plaintiff also points out that in contrast to *Ceballos*, Cunningham reported on matters of alleged improprieties involving individuals outside the scope of MSD employment, whereas the plaintiff in *Ceballos* reported on matters involving the conduct of attorneys within the department. *Id.* at 1560. Lastly, the Plaintiff notes that Ceballos' job duties specifically included reporting on wrongdoing to a supervisor, where as Cunningham's job duty did not. Even if the Court construed that Schardein instructing Cunningham to write a memo qualified as part of her employment, the fact that Cunningham sent the letter to Attorney General Stumbo with neither permission nor the knowledge of Schardein indicates that the action taken by Cunningham did not amount to a duty under her employment with MSD. Certainly Schardein did not consider it a part of her job as he was upset with her for not coming to him first and exceeding her authority. Accordingly, the Court finds that the allegations made by Cunningham to Attorney General Stumbo in her letter were not part of her employment duties with MSD.

### 4. The Allegations Made by Cunningham As a Sham

The Defendant asserts that the allegations made by Cunningham are a sham, and that she wrote the letter as an attempt to immunize herself from her own wrongful actions. As correctly noted by the Plaintiff, this argument is not one of law, but is one of fact that must be decided by a jury. *See supra*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, the Court finds that the Defendant's argument fails as a matter of law.

### 5. Failure to Exhaust Administrative Remedies

Lastly, the Defendant contends that Cunningham failed to exhaust her administrative remedies before filing her claim under the KWA. MSD argues that Cunningham should have abided by the MSD manual that requires employees to follow a specified grievance procedure. However, the Plaintiff notes that KWA does not explicitly require employees to exhaust administrative remedies before filing a claim under the act. *See* KRS §61.101-103. KRS §61.103(2) provides that "employees alleging a violation of [the Whistle Blower Act] may bring a civil action for appropriate injunctive relief or punitive damages, or both, within ninety (90) days after the occurrence of the alleged violation," but does not mandate an exhaustion of administrative remedies. There are no reported cases that state an employee must exhaust his/her administrative remedies before filing a claim under KWA. The cases cited by the Defendant in support of their argument are not on point, as those matters cited that do require exhaustion deal with agency actions within the specific division as mandated by the statute, not KWA cases. Accordingly, the Court finds that the Defendant's argument fails as a matter of law.

### CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **DENIED**. An appropriate order shall issue.